UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
In re:                                          :         Chapter 11
                                                :
     A.C.E. ELEVATOR CO., INC.,        :         Case No. 04-17994 (RDD)
                                                :
        Debtor                         :         (Jointly Administered)
------------------------------------------------------x

Appearances:

For the National Elevator Industry Benefit Plans:  O'Donoghue & O'Donoghue, by
Robert P. Curley

For the Debtor:  Rattet, Pasternak & Gordon Oliver LLP, by Robert A. Rattet and Julie
Cvek

## MEMORANDUM OF DECISION ON MOTION OF THE TRUSTEES OF NATIONAL ELEVATOR INDUSTRY BENEFIT PLANS FOR AN ORDER DIRECTING PAYMENT OF DELINQUENT CONTRIBUTIONS AS ADMINISTRATIVE EXPENSES

ROBERT D. DRAIN, United States Bankruptcy Judge:

The trustees (the "Trustees") of the National Elevator Industry Benefit Plans (the

"Plans," consisting of the Pension Plan, the Welfare Plan and the Educational Plan, as

defined below) seek an order directing the debtor, A.C.E. Elevator Co., Inc. ("ACE") to

pay delinquent Plan contributions, interest, liquidated damages, and attorney's fees and

costs as expenses entitled to administrative priority under 11 U.S.C. §§ 365(b)(1),

503(b)(1)(A), 507(a)(1), 1113(f) and 1114(e).

ACE concedes that it has not paid certain Plan contributions but contends that its

obligation to do so arose before December 21, 2004, the date that it filed its chapter 11

petition and, therefore, that the Trustees' claim is not entitled to administrative priority.[1]

---

[1]  At the hearing, the Trustees acknowledged that the unpaid Plan contributions for which they seek an
administrative priority relate to hours worked by ACE employees from November 2004 through the

ACE also argues that because the Trustees induced ACE's covered employees to walk off their jobs shortly after the start of the chapter 11 case in an attempt to coerce ACE to pay the Delinquent Contributions in violation of both the automatic stay under 11 U.S.C. § 362(a)[2] and the collective bargaining agreement under which ACE's Plan funding obligations arise, the Trustees' claim should be disallowed or subordinated.[3]  The Trustees contest these allegations, which also are the subject of a pending adversary proceeding.

## Jurisdiction

This contested matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B) over which the Court has jurisdiction under 28 U.S.C. § 1334(b).  Venue is proper under 28 U.S.C. § 1409(a).

## Facts

No evidence was offered at the hearing on the Trustees' motion.  Appended to the motion are (i) the affidavit, dated October 31, 2005, of Angela M. Vandegrift, Director of Finance for the Plans; (ii) the Joinder Agreement ("the "Joinder"), which expired by its terms on March 16, 2005, under which ACE and the International Union of Elevator Constructors Local One (the "Union") agreed that ACE would be bound by (x) the 2000-2005 collective bargaining agreement (the "CBA") among the Union, the Elevator Manufacturers Association of New York, Inc. and other parties, and (y) each of the Plans; (iii) the face page and pages 8-10 and 31-32 of the CBA, which pertain to the Plans; (iv)

---

petition date, December 21, 2004 (the "Delinquent Contributions").  Tr. at 19.  Exhibit F to Affidavit of Angela M. Vandegrift, appended to the Trustees' motion, quantifies the claim.  Including interest on overdue contributions, Exhibit F shows $75,8263.35 of contributions owing.  The Trustees have not quantified their claimed liquidated damages and attorneys fees and costs.
[2] *See Divane v. A & C Elec. Co.,* 193 B.R. 856, 862 (N.D. Ill. 1996).
[3] ACE also requests its costs pursuant to Fed. R. Bankr. P. 9011.

excerpts from the Restated Agreement and Declaration of Trust of the National Elevator

Industry Pension Plan (the "Pension Plan Agreement") establishing a pension plan (the

"Pension Plan"); (v) excerpts from the Restated Agreement and Declaration of Trust of

the National Elevator Industry Welfare Plan (the "Welfare Plan Agreement") establishing

a welfare, or health plan (the "Welfare Plan"); (vi) excerpts from the Restated Agreement

and Declaration of Trust of the National Elevator Industry Educational Plan (the

"Educational Plan Agreement;" with the Pension Plan Agreement and the Welfare Plan

Agreement, the "Plan Agreements") establishing an educational plan (the "Educational

Plan"); (vii) copies of ACE's reports to the Trustees of its Union employees' monthly

hours; (viii) the Trustees' chart of Plan contributions made by ACE, as well as the

Trustees' calculation of the Delinquent Contributions; and (ix) the Trustees' allocation of

the Delinquent Contributions among the Plans.[4]  ACE has not disputed the allocation,

although the Trustees' chart has certain headings ("Health-er," "Health-ee," and "Work

Preservation") whose meaning is not clear.

ACE's objection attaches a letter, dated December 31, 2004 that the Trustees

acknowledge[5] they sent to ACE's Union employees.  The letter informs the employees

that if ACE's November Plan contribution is not made, the Trustees "will have no

alternative but to terminate your coverage effective January 31, 2005," and that to be

eligible for continued coverage "you must either voluntarily terminate your employment

with the delinquent employer or participate in a work stoppage against the employer. . .

---

[4] Although the Plans are administered together and employers make consolidated payments, apparently
leaving the allocation among the respective Plans, at least in the normal course, to Trustees, Tr. at 20-21,
each Plan is a separate legal entity with its own contractual right to payment of contributions under the
applicable Plan Agreement.
[5] See Trustees' Memorandum of Law in Support of Motion to Dismiss Complaint adversary proceeding
No. 05-01158 (docket No. 51), in which ACE asserts violation of the automatic stay under 11 U.S.C. §
362(a), at 2-3, 11-12.

.".[6] ACE's objection also attaches the transcript of the March 2, 2005 hearing in this case and a letter, dated August 18, 2005, from Robert Curley, the Trustees' counsel, to Kevin Russell, counsel to American Manufacturers Mutual Insurance Company, ACE's surety on several contracts, which pertain to whether and under what conditions the CBA prohibited the Union from engaging in a strike or its members from staging a walk-out.

ACE's business was, and, to the extent that it still has a business, is, the construction, modernization, maintenance and repair of elevators in the New York City area.[7] ACE built the elevator systems in the World Trade Center and until September 11, 2001 had been their sole servicer, from which it derived 90 percent of its revenue.[8] Unable to make up enough of that income from other sources, ACE filed under chapter 11 on December 21, 2004.

The Plans are multi-employer benefit plans under 29 U.S.C. §§ 1002(2), (3) and (37).[9] Under the Joinder, ACE agreed with the Union to be bound by the Plan Agreements, as well as the CBA, and "to make contributions covering all of its employees represented by the Union to the [Plans] as required by the [CBA]." Joinder, ¶¶ 1, 2.

The CBA obligates ACE to contribute to each of the Plans a specified dollar amount "for each hour of work performed" by Union members in its employ. CBA ¶¶

---

[6] Other hearings in this case have established that ACE's Union employees left their job sites on or around January 27, 2005 and have not returned to work for ACE (see also Tr. at 26-7), seriously impairing ACE's ability to continue in business. ACE then sold ongoing maintenance contracts to a competitor.
[7] Affidavit of Ronald Baamonde dated December 21, 2004 (the "Baamonde Affidavit") pursuant to Local Bankruptcy Rule 1007-2 at ¶ 8.
[8] Baamonde Affidavit at ¶ 15.
[9] Trustees' motion at ¶ 1.

G(1)(a) and (b), at 8-9 and E, at 31[10] (pertaining to the Welfare, Pension and Educational Plans, respectively).

The Plan Agreements do not separately describe ACE's Plan funding obligations, with the exception of addressing certain administrative matters and referring to the employer's obligation to fund the Plans under the CBA. Thus, Article VI of each Plan Agreement provides,

> Par 4. <u>Effective Date of Contributions</u>. All contributions shall be made effective as of the 15th day of each month for the preceding month *and shall continue to be paid as long as the Employer is so obligated pursuant to the [CBA]* or until he ceases to be an Employer within the meaning of this Agreement and Declaration of Trust as herein provided.
>
> Par 5. <u>Rules of Contributions</u>. The Trustees shall have the power to adopt rules and regulations relating to the submission, processing and accounting of Employer contributions including but not limited to prescribing the time, place and manner in which contributions to the [Plan] are to be made by the Employer, and to prescribe the forms and reports that must be used in submitting contributions.

(Emphasis added.)

Article VI of each Plan Agreement gives the Trustees the following remedies:

> Par 6. <u>Collection and Enforcement</u>. . . . The Trustees shall have the power to demand and collect the contributions of the Employer to the Fund. In addition to any other remedies to which the parties may be entitled, any Employer in default for five (5) days will be required to pay interest on the monies due to the Trustees at the rate charged by the Internal Revenue Service at the time of delinquency, together with all reasonable expenses of collection incurred by the Trustees, including but not limited to attorney's fees. The foregoing five (5) day 'grace period' shall not apply to any Employer with an outstanding obligation to the Trustees. . . . If the Trustees file suit to collect any amounts due the Trust Fund, the Trustees shall also seek liquidated damages in the amount of twenty percent (20%) of the contributions due at the time the lawsuit is filed.

---

[10] Because the Trustees chose to submit only excerpts from the CBA, this is the best identification that can be given.

Finally, Art. VI ¶ 7 of each Plan Agreement provides that if the employer is two months late in making its required Plan contribution "and has failed to submit the required accounting of Employer contributions showing the Employee(s) who worked for him and the hours worked," the Trustees may determine the amount of the delinquency by averaging past monthly payments.

As noted, ACE concedes that it has not paid the Delinquent Contributions to the Plans, excusing such default, however, on the basis that the Delinquent Contributions are on account of prepetition hours worked by its employees and, therefore, prepetition obligations that ACE is precluded from paying ahead of other prepetition unsecured claims.  The parties agree that ACE has paid its Plan contributions attributable to all postpetition hours worked.  Tr. at 19.

It is undisputed that ACE sent the Trustees its reports under Art. VI ¶ 5 of the Plan Agreements, which cover the Delinquent Contributions, and thus detail the number of hours that its Union employees worked in November and December 2004, only after the start of the chapter 11 case.

## Discussion

### 1.  The Trustees' Claim under 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(1)

The Trustees argue that the Delinquent Contribution claim is entitled to administrative priority under 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(1) because the Plans accepted and processed ACE's reports, and determined the amounts owing, postpetition. ACE argues, to the contrary, that because its Delinquent contributions to the Plans are based on its Union employees' hours worked prepetition, the Delinquent Contributions are prepetition claims not entitled to administrative priority.

In the light of Bankruptcy Code section 503(b)(1)(A)'s plain meaning, relevant case law, and the underlying nature of the Delinquent Contribution claim, ACE's position is correct; the Delinquent Contribution claim is not entitled to priority under 11 U.S.C. §§ 503(b) and 507(a)(1).

Section 507(a)(1) of the Bankruptcy Code states that administrative expenses allowed under Bankruptcy Code section 503(b) shall have a first priority.  Section 503(b)(1)(A) provides,

> (b)     After notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including—
>
> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries or commissions for services rendered after the commencement of the case.

11 U.S.C. § 503(b)(1)(A).  As recently confirmed by the Supreme Court, when determining whether a particular claim or class of claims is entitled to priority, a court must be "guided in reaching [its] decision by the equal distribution objective underlying the Bankruptcy Code, and the corollary principle that provisions allowing preferences must be tightly construed."  *Howard Delivery Service, Inc. v. Zurich American Ins. Co.*, __ U.S. __, No. 05-128, slip op. at 14 (June 15, 2006).  *See also Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 100 (2d Cir. 1986) ("Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed.").  The claimed priority's purpose needs to be clear from the statute, because "'[t]o give priority to a claimant not clearly entitled thereto is not only inconsistent with the policy of equality of distribution; it dilutes the value of the priority for those creditors Congress

intended to prefer.'"  *Howard Delivery Service*, __ U.S. __, No. 05-128, slip op. at 15

(quoting *Cramer v. Mammoth Mart, Inc.* (*In re Mammoth Mart, Inc.*), 536 F.2d 950, 953

(1st Cir. 1976)).

Relying in large measure on the logic of *Mammoth Mart*, the Second Circuit in

*McFarlin's* determined that a debtor's liability under 29 U.S.C. §§ 1381(a) *et seq*. for

withdrawal from a pension plan did not give rise to a claim under Bankruptcy Code

section 503(b)(1)(A) entitled to priority under section 507(a)(1), even though the

withdrawal occurred six months after the start of the chapter 11 case.  789 F.2d at 103-

104.  Consistent with the plain meaning of section 503(b)(1)(A), the *McFarlin's* court

noted that "an expense is administrative only if it arises out of a transaction between the

creditor and the bankrupt's trustee or debtor in possession," *id.* at 101 (internal citations

omitted); that is, the claim will have a first priority only if the transaction giving rise to it

occurred postpetition.  The Second Circuit clarified, however, that "[a] debt is not entitled

to priority simply because the right to payment arises after the debtor in possession has

begun managing the estate." *Id.* (internal citations omitted).  Instead, the *McFarlin's*

court concluded, whether the "'withdrawal liability' is an administrative expense *depends*

*upon the consideration supporting the Fund's right to receive it.*"  *Id*. (emphasis added).

Concluding that "the employer's lump sum payment in satisfaction of this withdrawal

liability is made to guarantee pension benefits already earned by those employees

covered by the Plan," the court held that "[t]he consideration supporting the withdrawal

liability is, therefore, the same as that supporting the pensions themselves, the past labor

of the employees covered by the Plan., *id.* at 101-02, and denied the withdrawal claim

administrative expense status.  *Accord*, *In re Cott Corp.*, 47 B.R. 487 (Bankr. D. Conn.

1984); *In re Kessler, Inc.*, 23 B.R. 722 (Bankr. S.D.N.Y. 1982), *aff'd sub nom.,*

*Amalgamated Insurance Fund v. Kessler, Inc.*, 55 B.R. 735 (S.D.N.Y. 1985).[11]

Based on the same rationale, in *In re Finley, Kumble*, 160 B.R. 882, 887-91

(Bankr. S.D.N.Y. 1993), a debtor's pension plan contribution obligations, which came

due postpetition but were based on work performed by the debtor's employees

prepetition, were not entitled to priority under section 503(b)(1)(A). The *Finley, Kumble*

court reasoned that the funding obligations did not meet either of the two requirements of

section 503(b)(1)(A), that they "(1) arise out of a postpetition transaction between the

creditor and the . . . debtor . . . and (2) be allowable only to the extent that the

consideration supporting the claimant's right to payment was both supplied to and

beneficial to the debtor's estate in the operation of its business." *Id.* at 889-91 (citing *In*

*re Mammoth Mart,* 536 F.2d at 954).

Here, the right to administrative expense priority for the Delinquent Contributions

is even less supportable than in *McFarlin's* and *Finley, Kumble* because the parties'

agreements even more clearly provide that ACE's funding obligation is "for each hour of

work performed" by the covered employees, CBA ¶¶ G(1)(a) and (b), pp. 8-9; E, p. 31;

---

[11] The Second Circuit noted that its decision did not conflict with prior holdings that severance pay is an administrative expense, because the severance claims arose from, and were on account of, employees' postpetition termination. *See Rodman v. Rinier* (*In re W.T. Grant Co.*), 620 F.2d 319, 320-21 (2d Cir. 1980), *cert. denied*, 446 U.S. 983 (1980); *Zelin v. Unishops, Inc.* (*Matter of Unishops, Inc.*), 553 F.2d 305, 308 (2d Cir. 1977); *Straus-Duparquet, Inc. v. Local U. No. 3 Int. Bro. of Elec. Wkrs.* (*In re Straus-Duparquet, Inc.*)*,* 386 F.2d 649, 650-51 (2d Cir. 1967):

> These decisions rest on the basis that severance pay is compensation for the hardship which all employees, regardless of their length of service, suffer when they are terminated and that it is therefore 'earned' when the employees are dismissed. Accordingly it is granted a first priority as a cost of doing business during the bankruptcy proceeding. An employer's withdrawal liability payment, on the other hand, is the means by which the employer funds benefits that his employees have *'earned' by their past service* and that he would normally finance through continuing contributions to his employee's pension plan.

*McFarlin's*, 789 F.2d at 104 (emphasis added).

see also Plan Agreements Art. VI ¶ 4 (providing that Plan contributions shall continue for

as long as the employer "is so obligated pursuant to the [CBA]"); and the Delinquent

Contributions concededly are in respect of prepetition hours worked.[12]  Moreover, as

noted by the Supreme Court in *Howard Delivery Service*, employer contributions to

pension and welfare plans, like those at issue here, together with wages, remunerate

employees for services rendered.  __ U.S. __, No. 05-128, slip op. at 2, 6-7.  If the

contributions at issue are in respect of employees' services that were rendered

prepetition, as here, under the plain meaning of Bankruptcy Code section 503(b)(A) and

the rationale of the foregoing decisions, the claim for such contributions cannot be

accorded priority status under Bankruptcy Code sections 503(b)(1)(A) and 507(a)(1).

*McFarlin's*, 789 F.2d at 101-102.

All of the authorities cited by the Trustees for a contrary reading of sections

503(b) and 507(a) are from courts outside the Second Circuit or construe a different

section of the Bankruptcy Code, section 507(a)(4).[13]  *See, e.g., In re Braniff, Inc.*, 218

B.R. 628, 631 (Bankr. M.D. Fla. 1998) (holding that under Bankruptcy Code section

507(a)(4) the "services" were an insurer's provision of health insurance coverage for

employees during the 180-day period immediately before the petition date, rather than

---

[12] Counsel for the Trustees also acknowledged that the "health benefits and the pension benefits are based on hours worked in the year, and that's how you qualify."  Tr. at 13.

[13] Section 507(a)(4), as applicable to ACE's chapter 11 case, provides:

    (a)   The following expenses and claims have priority in the following order:
    (4) Fourth, allowed unsecured claims for contributions to an employee benefit plan—
        (A)  arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only
        (B)  for each such plan, to the extent of—
            (i)    the number of employees covered by each such plan multiplied by $4,925; less
            (ii)   the aggregate amount paid to such employees under paragraph (3) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

the earlier labor by the employees on which such coverage was based); *accord*, *Ivey v. Great West Life & Annuity Ins. Co.* (*In re Ivey*), 308 B.R. 752, 759 (M.D.N.C. 2004); *Columbia Packing Co. v. Pension Benefit Guaranty Corp.*, 81 B.R. 205 (D. Mass. 1988); *Official Comm. of Unsecured Creditors v. Travelers Indem. Co.* (*In re Maxwell Newspapers, Inc.*), 192 B.R. 633, 636 (Bankr. S.D.N.Y. 1996) ("[C]ourts have taken for granted that the provision of insurance constitutes 'services' for the purposes of section 507(a)(4).").

The Trustees argue that because Congress used the phrase "services rendered" in both sections 507(a)(4) and 503(b)(1)(A), the *Maxwell* line of cases' construction of "services" for purposes of section 507(a)(4) applies equally in the context of section 503(b)(1)(A). The Trustees ignore, however, that section 507(a)(4) applies by its plain terms only to *prepetition* services, while section 503(b)(1)(A) has two different requirements. To receive priority under Bankruptcy Code section 503(b)(1)(A), a claim must be for the "actual, necessary costs and expenses of preserving the estate," that is, for services providing a *postpetition benefit* to the estate. 11 U.S.C. § 503(b)(1)(A).[14] *See In re Finley, Kumble*, 160 B.R. at 890.

Two other cases cited by the Trustees also are distinguishable. First, in *In re Greater Southeast Cmty. Hosp. Found., Inc.*, 267 B.R. 7, 24 (Bankr. D.D.C. 2001), a debtor's obligation, accruing postpetition, to make a benefit plan contribution in respect of prepetition work by its employees was held to be an administrative expense because the debtor's liability hinged on workers' employment as of a certain date, which fell

---

[14] Unlike Bankruptcy Code section 507(a)(1), there is no requirement under section 507(a)(4) that claims for contributions to an employee benefit plan be allowed under section 503(b). Whether the Delinquent Contributions would be allowable as junior priority claims under section 507(a)(4) is not before the Court.

postpetition.[15]  Indeed, the court stated that were it not for this contractual distinction, it

"would feel bound to separate the claim into its prepetition and postpetition components.

But in this case, the employees gained no right to payment based on prepetition work. . .

." *Id.*

Second, in addition to applying section 507(a)(4), the *Columbia Packing* court

held that the debtor's obligation to fund its pension plan was entitled to administrative

priority under sections 503(b)(1)(A) and 507(a)(1) because the obligation became due

during the postpetition period, notwithstanding that it was based on work performed

prepetition.  81 B.R. at 208-09.  The court concluded that this "past service liability" was

"more properly viewed as an actuarial unit of measure for determining the employer's

current periodic contribution than as compensation for work performed before the

inception of the plan."  *Id.* at 209.  *Columbia Packing* is contrary, however, to the law in

this Circuit that administrative priority is not based simply on an obligation's due date,

but, rather, depends on the date of the consideration underlying the claim, *see*

*McFarlin's*, 789 F.2d at 101 (internal citation omitted); *In re Finley, Kumble*, 160 B.R. at

892-93, and has been expressly criticized in this district.  *LTV Corp. v. Pension Benefit*

*Guaranty Corp. (In re Chateaugay Corp.)*, 115 B.R. 760, 777 (Bankr. S.D.N.Y. 1990)

("*Chateaugay I*"), *subsequently withdrawn and vacated by consent order*, 1993 WL

388809 (S.D.N.Y. 1993).  In *Chateaugay I*, the PBGC sought administrative expense

priority for the debtors' pension plan termination liability.  115 B.R. at 764.  The court

found that "although the administrative action did not occur until post-petition, the so-

called 'triggering event' *is not* the termination of the plans by the PBGC, but rather *the*

---

[15] Under the plan documents, if the workers had not been employed on that trigger date, there would have
been no right to any plan contribution.  *Id.*

*pre-petition labor of LTV Steel's employees.*"  *Id.* at 774-75 (criticizing *Avellino &*

*Bienes v. M. Frenville Co.* (*In re M. Frenville Co.*), 744 F.2d 332 (3d Cir. 1984))

(emphasis added).  On appeal, the district court also found that the PBGC's claims were

"pre-petition contingent claims because the labor giving rise to the pension obligations

was performed pre-petition" and, therefore, the claims were not entitled to administrative

priority.  *LTV Corp. v. Pension Benefit Guaranty Corp. (In re Chateaugay Corp.)*, 130

B.R. 690, 697 (S.D.N.Y. 1991) ("*Chateaugay II*"), *subsequently withdrawn and vacated*

*by consent order*, 1993 WL 388809 (S.D.N.Y. 1993).[16]  As discussed above, the

consideration, or triggering event for the Delinquent Contributions was the prepetition

labor provided by ACE's hourly employees.

    Moreover, even if it were legally relevant that ACE sent its Plan contribution

reports to the Trustees postpetition, it is clear under Art. VI ¶ 4 of the Plan Agreements

that ACE's liability stems from the CBA (with its "for hours worked" formulation), not

the administrative processes by which the Trustees calculate contributions amounts after-

the-fact.

    Finally, the services provided by the Trustees *to ACE*, as opposed to the Plan

beneficiaries, in processing and calculating amounts due in respect of Plan contributions

do not satisfy section 503(b)(1)(A)'s standard of "actual, necessary expenses of

preserving the estate," because they conferred no discernable benefit on the estate.  *See In*

*re Finley, Kumble*, 160 B.R. at 891, which similarly held that the benefit plan funding

---

[16] As noted by the *Finley, Kumble* court specifically with respect to *Chateaugay I* and *Chateaugay II*,  "a
logical and well-reasoned decision, despite vacatur [because of a settlement], is always persuasive
authority, regardless of its district or circuit of origin or its ability to bind."  160 B.R. at 888.

contributions at issue were not necessary to preserve the debtor's estate or to promote

administration of the case.[17]

### 2.  The Trustees' Claim under 11 U.S.C. §§ 1113(f) and 365(b)(1)

The Trustees also argue that the Delinquent Contributions have administrative

priority under section 1113(f) of the Bankruptcy Code, which provides,

> No provision of this title shall be construed to permit a trustee to
> unilaterally terminate or alter any provision of a collective bargaining
> agreement prior to compliance with the provisions of this section.

11 U.S.C. § 1113(f).  The Trustees contend that ACE's failure to pay the Delinquent

Contributions is a breach of the CBA and that such breach constitutes a unilateral

termination or alteration prohibited by section 1113(f).[18]

As noted, ACE argues, to the contrary, that the Trustees and the Union breached

the CBA, or should be estopped from asserting a breach, as a result of having precipitated

an allegedly wrongful walk-out.  This issue may be left for the related adversary

proceeding, however, because controlling precedent contrary to the Trustees' position

governs the section 1113(f) issue.  *See In re Ionosphere Clubs, Inc.*, 22 F.3d 403 (2d Cir.

1994), in which the Second Circuit held that section 1113(f) does not preempt the priority

scheme of section 507 of the Bankruptcy Code:  "'[j]udicial ordering of benefit claims

pursuant to § 507 is not equivalent to employer avoidance of obligations under a

---

[17] The Court makes this determination without having to consider ACE's argument that not only did the Trustees not benefit the estate, they affirmatively harmed it by sending the December 31, 2004 letter to employees threatening termination of health benefits unless ACE paid the Delinquent Contributions to the Health Plan or the employees quit or engaged in a work stoppage by January 31, 2005, and the fact that employees stopped working for ACE shortly thereafter.  Of course, if such facts are established in the related adversary proceeding noted above, there could be an additional reason for holding that ACE's Plan contributions did not benefit the estate.

[18] On the record of the hearing, the Trustees may have waived this argument, Tr. at 14, but because this is not clear, the Court considered it.

collective bargaining agreement.'" *Id.* at 407 (quoting *In re Ionosphere Clubs, Inc.*, 154

B.R. 623, 630 (S.D.N.Y. 1993)).

In *Ionosphere*, the debtor's unions argued that unpaid prepetition vacation pay

claims must be accorded a first priority under section 1113(f), sidestepping the

requirements of section 507(a)(1).  *Id.* at 405.  The Second Circuit disagreed:

> We find that the Third Circuit's holding in *Roth*[19] -- that sections 1113(f)
> and 507 can be reconciled -- to be the better reasoned position [among the
> acknowledged split of authorities] and the one most consistent with our
> analysis of the preemptive scope of section 1113(f) in *Ionosphere Clubs,
> Inc.*, 922 F.2d 984 (2d Cir. 1990). . . .  Implying a superpriority for claims
> arising under CBAs also would disrupt the careful balancing of competing
> policies embodied in section 507.  Section 507 is intended to be the
> exclusive list of priorities in bankruptcy.  Priorities are to be fixed by
> Congress.  Courts are not free to fashion their own rules of superpriorities
> or subpriorities within any given priority class. . . .  Recognizing this
> restriction, we are loath to create a class of claims with superpriority status
> absent express statutory authority.  Section 1113 does not address the
> priority to be accorded claims arising from a debtor's obligations under a
> CBA.  We must therefore assume that Congress intended that the priorities
> set forth in section 507 should apply to these claims.

*Ionosphere*, 22 F.3d at 407-408 (internal citations omitted).

Therefore, while the Trustees may assert a general unsecured claim against ACE

for the Delinquent Contributions, ACE's adherence to the Bankruptcy Code's

requirements of when, and when not, to pay claims in full does not equate to ACE's

unilateral alteration of the CBA in derogation of section 1113(f).  Section 1113(f) does

not relieve the Trustees of the burden of establishing that the Delinquent Contributions

claim is entitled to first priority under sections 507(a)(1) and 503(b)(1)(A), which, as

discussed in the previous section, has not been met.

---

[19] *In re Roth American, Inc.*, 975 F.2d 949 (3d Cir. 1992).

The Trustees also argue[20] that because ACE did not reject the CBA postpetition, and, after the walk-out, let it expire by its terms on March 16, 2005, ACE assumed the agreement.  Were this true, ACE would have to cure all existing defaults, and its breach of the assumed agreement would give rise to a postpetition claim entitled to administrative priority.  *See* 11 U.S.C. § 365(b)(1)(A); *Nostas Assocs. V. Costich* (*In re Klein Sleep Prod., Inc.*), 78 F.3d 18 (2d Cir. 1996).  The Trustees rely on *Adventure Resources, Inc. v. Holland*, 137 F.3d 786, 798 (4th Cir. 1998), *cert. denied*, 525 U.S. 962 (1998), in which the debtor was found to have assumed its collective bargaining agreement by virtue of having failed to reject it in accordance with section 1113.  This aspect of the decision has been persuasively criticized, however, and it is inconsistent with the requirement of notice and a hearing before the assumption of an executory contract.  *See United Food & Commercial Workers Union, Local 211 v. Family Snacks, Inc.* (*In re Family Snacks, Inc.*), 257 B.R. 884, 904 (8th Cir. B.A.P. 2001) ("the *Adventure Resources* decision [is] inconsistent with the explicit requirement under § 365 that a debtor may assume a contract only upon a motion"); *In re Greater Southeast Cmty. Hosp. Found.,* 267 B.R. at 25-26 ("[T]he analysis in *Adventure Resources* ignores § 365(a) of the Bankruptcy Code which provides that 'the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor;" assumption can be accomplished only by court order.).  *See also In re Leslie Fay Cos.,* 168 B.R. 294, 302 (Bankr. S.D.N.Y. 1994) ("The Second Circuit's framework for analyzing the interplay of section 1113(f) and other sections of the Code leads me to conclude that section 1113(f) does not negate the need for notice and a hearing where a

---

[20] As with their section 1113(f) argument, the Trustees may have waived this argument at the hearing, Tr. at 14, but because this is not clear, the Court considered it.

proposed postpetition modification to a collective bargaining agreement is outside of the ordinary course of the debtor's business."); *In re Certified Air Technologies, Inc.*, 300 B.R. 355, 367-69 (Bankr. C.D. Cal. 2003).

This Court therefore declines to find an implied assumption of the CBA by virtue of ACE's not having rejected the CBA under section 1113 before its expiration. For the same reason, the Delinquent Contributions claim is not entitled to be paid in full under section 365(b)(1) of the Bankruptcy Code, which requires the cure of all defaults if an executory contract is assumed. 11 U.S.C. § 365(b)(1)(A). *Leslie Fay*, 168 B.R. at 301-302; *In re Family Snacks, Inc.*, 257 B.R. at 902-903 ("Implied assumption has no place in the law of executory contracts [in bankruptcy].").

### 3.    The Trustees' Claim under 11 U.S.C. § 1114(e)

Lastly, the Trustees contend that the Welfare Plan is entitled under Section 1114(e) of the Bankruptcy Code to be paid the Delinquent Contributions due it, as "retiree benefits."[21]

Section 1114(e) of the Bankruptcy Code states in pertinent part:

(e)(1) Notwithstanding any other provision of this title, the debtor in possession . . . *shall timely pay* and shall not modify *any retiree benefits* . . . . .

(2) *Any payment for retiree benefits* required to be made before a plan confirmed under section 1129 of this title is effective *has the status of an allowed administrative expense as provided in section 503* of this title.

11 U.S.C. § 1114(e)(1), (2) (emphasis added). Therefore, Bankruptcy Code section 1114(e), unlike section 1113(f), apparently provides for the timely payment of any retiree

---

[21] ACE did not respond to this argument, except to point to the Trustees' alleged breach of the automatic stay and the Union employees' allegedly unlawful walk-out. These issues, however, will be determined in the pending adversary proceeding. The Court's ruling with respect to Bankruptcy Code section 1114(e) is without prejudice to ACE's rights in the adversary proceeding, including ACE's ability to obtain an order, on a proper showing, disallowing or subordinating the Trustees' claims.

benefits before confirmation of a chapter 11 plan and accords such obligation administrative expense priority, regardless of when earned.  *See In re Ionosphere Clubs, Inc.*, 22 F.3d at 408 (contrasting sections 1113(f) and 1114(e)); *In re Certified Air Technologies*, 300 B.R. at 368.  That is, by its plain terms Bankruptcy Code section 1114(e) does not appear to make any distinction between retiree benefit obligations on account of prepetition consideration and those arising postpetition; each would be payable as an administrative expense.

Notwithstanding the statute's apparent plain meaning, however, one of the few cases dealing with section 1114(e) recognized a pre/postpetition distinction.  *See Adventure Resources, Inc. v. Holland*, 193 B.R. 787 (S.D. W.Va. 1996) ("*Adventure Resources I*"), *rev'd in part on other grounds, aff'd in part*, 137 F.3d 786 (4th Cir. 1998), *cert. denied*, 525 U.S. 962 (1998) ("*AdventureResources II*").  Noting the general proposition that priorities in bankruptcy should be construed narrowly and relying on an unofficial legislative history of section 1114,[22] the *Adventure Resources I* court held that section 1114(e) does not apply to obligations to fund retiree health plans that came due prepetition.  *Id.* at 796-98.[23]

---

[22] *See* Andrea J. Winkler, Legislative History of the Retiree Benefits Bankruptcy Protection Act of 1988 ("Winkler"), published in App. E-1 *Collier on Bankruptcy* App. Pt. 8-9 (Alan N. Resnick & Henry J Sommer, eds. 15th ed. 2005).

[23] This aspect of the *Adventure Resources I* decision was not necessary to the determination on appeal and was addressed only as follows by the Fourth Circuit:

> The . . . district court held that § 1114(e) applies only to benefit payments due after the filing of the bankruptcy petition.  The Funds respond forcefully that the word 'any' in paragraphs (1) and (2) encompasses both pre- and postpetition payments.  Inasmuch as we have already decided that all of the Coal Act claims arose postpetition, we leave for another day the task of ascertaining the scope of § 1114(e).

*Adventure Resources II*, 137 F.3d at 795.  No other reported decision has addressed *Adventure Resources I*'s construction of section 1114(e).

The Court declines to follow *Adventure Resources I* with respect to the

Delinquent Contributions to the Welfare Plan at issue here, however, because it conflicts

with the plain language of section 1114(e).[24] Moreover, contrary to the suggestion in

*Adventure Resources I* that section 1114(e)'s legislative history is "sketchy", 193 B.R. at

796, it is clear that Congress was motivated to enact the provision by a widely publicized

attempt to avoid paying prepetition retiree health claims. As the official legislative

history states, "The bill, as amended, addresses situations with respect to retiree insurance

benefits, such as occurred last year when LTV Corporation, after filing a Chapter 11

Bankruptcy petition, immediately terminated the health and life insurance benefits of

approximately 78,000 retirees." S. Rep. 100-119, at 1-2 (1987). If further clarification of

what Congress was responding to is necessary, it is provided by *In re Chateaugay Corp.,*

64 B.R. 990, 993 (S.D.N.Y. 1986):

> Upon filing for reorganization, LTV took the position that its obligation to
> provide benefits under the medical and health plans to Retirees derived
> from their prepetition work for the debtors. *LTV concluded that the
> Retirees held prepetition unsecured claims which could not be paid absent
> a court order or under a confirmed plan of reorganization.*

(Emphasis added). The informal legislative history relied upon by *Adventure Resources

I*, moreover, is not to the contrary. It states merely that "retiree benefits paid during the

pendency of the case have the status of allowed administrative expenses," Winkler at

App. Pt. 8-9, p. 1, and does not address whether the retiree benefits required to be "timely

paid" under section 1114(e)(1) -- and, thus, entitled to administrative priority under

section 1114(e)(2) -- include benefits arising prepetition. Also supporting a plain reading

---

[24] It also should be noted that Congress knows how to limit the applicability of a section of the Bankruptcy
Code to payment obligations arising postpetition. *See, e.g.*, 11 U.S.C. § 365(d)(3), which provides that the
trustee shall "timely perform all the obligations of the debtor . . . *arising from and after the order for relief*
under any unexpired lease of nonresidential real property." (Emphasis added.)

of the statute are *Buckner v. Westmoreland Coal Co.* (*In re Westmoreland Coal Co.*), 213 B.R. 1, 18 (Bankr. D. Colo. 1997) (stating in dicta that "notwithstanding their prepetition nature, [section 1114(e)] claims must be accorded an administrative expense priority"); *In re Certified Air Technologies*, 300 B.R. at 358, 371; and *In re GF Corp.*, 115 B.R. 579, 580-81 (Bankr. N.D. Ohio 1990) ("*GF I*"), *vacated on settlement*, 120 B.R. 421 (Bankr. N.D. Ohio 1990) ("*GF II*"), in which prepetition retiree benefit claims were considered, without discussion of any pre/postpetition issue, to be entitled to section 1114(e)(2) treatment. *See also* 7 *Collier on Bankruptcy* ¶ 1114.03[5] ("[S]ection 1114(e)(2) gives payments of retiree benefits the status of an allowed administrative expense. This appears to be true regardless of when the right to receive such benefits vests.").

Having determined that Congress in Bankruptcy Code section 1114(e) overrode the pre/postpetition distinction applicable under 11 U.S.C. § 503(b)(1)(A), three issues under section 1114 remain, although the first, whether the Delinquent Contributions to the Welfare Plan are "retiree payments" under Bankruptcy Code section 1114(a), is easily resolved. [25] As a health plan, the Welfare Plan fits within the section. 11 U.S.C. § 1114(a); *In re Certified Air Technologies*, 300 B.R. at 371; *In re N.Y. Trap Rock Corp*, 126 B.R. 19, 22-3 (Bankr. S.D.N.Y. 1991).

The second issue is whether the Delinquent Contributions to the Welfare Plan are nevertheless excluded from section 1114(a) because that Plan is a multiemployer plan

---

[25] Section 1114(a) states,

> For purposes of this section, the term 'retiree benefits' means payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title.

11 U.S.C. § 1114(a).

and nothing in the record suggests that any beneficiaries of the Welfare Plan are ACE retirees, their spouses or dependents.

It appears clear, however, that a debtor's contributions to a multiemployer health plan are entitled to administrative priority under section 1114(e)(2) even though the debtor may not have any retired employees receiving benefits under the plan. *See In re Certified Air Technologies*, 300 B.R. at 369-372, in which the court rejected the debtor's arguments that (x) a multiemployer plan was not a plan, fund or program "maintained or established . . . by the debtor" as required by section 1114(a), and (y) "retiree benefits" under section 1114(a) could not be owed by a debtor without any retirees.

The *Certified Air* court concluded that "Section 1114(a)'s relevant phrase is 'maintained or established in whole *or in part* by the debtor.'" *Id.* at 371 (emphasis added). Noting that the definition of "retiree benefits" in section 1114(a) is broad, including "indirect payments to any person or entity for the purpose of providing or reimbursing payments for medical, surgical, hospital care and other benefits," *id.*, the court also quoted the following legislative history to support its holding that multiemployer plans fall within the section 1114(a)'s coverage if they provide for *any* retiree benefits:

> The Committee recognizes that some debtors may provide retiree benefits by contributing in accordance with a collective bargaining agreement to multiemployer health, welfare, and pension plans. These plans are trust funds established and maintained by more than one employer pursuant to one or more collective bargaining agreements. Pursuant to Federal employee benefits and labor laws, these plans are separate legal entities and are administered by labor-management boards of trustees for the exclusive benefit of the plan participants and beneficiaries. They are generally financed solely by employer contributions, and a loss of such contributions from any one employer detracts from a plan's ability to pay benefits to the participants and beneficiaries of the plan as a whole.

> Retiree benefits include contributions or other required payments to multiemployer plans for the purposes described in the bill. Therefore, the requirements of S. 548 apply to these benefits arrangements.

S. Rep. No. 100-119, at 3-4 (1987).  *See also In re Westmoreland Coal,* 213 B.R. at 19 ("The modifying phrase 'in whole or in part' suggests that the covered funds or plans would include those with multiple contributors."); 7 *Collier on Bankruptcy* ¶ 1114.02[2][c] (section 1114(a) covers not only self-insured debtors, but also those with third party insurance plans or multi-employer plans).  *Certified Air Technologies'* analysis is persuasive; as a health plan that benefits retirees, the Welfare Plan is encompassed by section 1114(a) even if ACE currently has no retirees.

The final issue under Bankruptcy Code section 1114 is whether all of the Delinquent Contributions owing to the Welfare Plan are entitled to priority under section 1114(e) or, instead, only ACE's contributions in respect of the Welfare Plan's health benefits attributable to retirees and their spouses and dependents.  Section 1114(a) states that "'retiree benefits' means payments . . . *for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents*" for medical and related benefits.  11 U.S.C. § 1114(a) (emphasis added).  If a material portion of the Delinquent Contributions to the Welfare Plan were used to fund benefits for *current* employees and their families, arguably the statute would not apply to such payments, particularly given that priorities in bankruptcy must be construed narrowly.  *Howard Delivery Service*, __ U.S. __, No. 05-128, slip op. at 14.  This view is supported by the legislative history, which states, "Retiree benefits include contributions or other required payments to multiemployer plans *for the purposes described in the bill*."  S. Rep. 100-119, at 4 (emphasis added).  (On the other hand, the legislative history also states that

multiemployer plans "are generally financed solely by employer contributions, and a loss
of such contributions from any one employer detracts from a plan's ability to pay benefits
to the participants and beneficiaries of the plan as a whole," *id.*, suggesting that Congress
might have intended to accord a priority to all benefit contributions due to multiemployer
plans that provide health benefits to retirees.)

Given the importance of this question[26] and the fact that the parties have not
addressed it, either in the factual record or their briefing, the Court will require further
submissions on the issue.

As for the Trustees' request for interest, liquidated damages, and attorney's fees
and costs, it is clear that section 1114 does not cover the payment of such amounts, which
are not "payments . . . for the purpose of providing or reimbursing payments for . . .
medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident,
disability, or death" under the Welfare Plan.  11 U.S.C. § 1114(a).  Consequently, they
are not entitled to administrative priority under Bankruptcy Code section 1114(e).  *See In
re Certified Air Technologies*, 300 B.R. at 372 (allowing claim for liquidated damages
and attorneys fees only as a general unsecured claim).

The Court will also require a report by ACE regarding (x) whether it has any
unencumbered funds to pay allowed Delinquent Contributions to the Welfare Plan and
(y) whether it is administratively solvent.  This information is important given the
treatment accorded to unpaid retiree benefits under sections 1114(e)(1) and (2) of the
Bankruptcy Code.  *See, e.g., In re GF I*, in which the court noted the tension between the
two subsections of section 1114(e) in the context of an administratively insolvent debtor:

---

[26] Unless, of course, the Trustees show that either none or all of the Plan's beneficiaries are retirees, their
spouses and dependents, in which case the issue is moot.

Although the granting of administrative expense priority in subsection (e)(2) may not, on its face, conflict with the directive of subsection (e)(1) that the debtor-in-possession 'shall timely pay' benefits, in practice it is quickly apparent that these provisions create an inherent contradiction within the statute.  In general, administrative expenses are not timely paid at all.  In the case of professional compensation, for example, interim payments may be made 'not more than once every 120 days . . . .' Furthermore, courts are generally reluctant to permit the payment of *any* administrative expenses where it appears that there may be insufficient funds to pay all these claims -- because in that situation, all administrative expense claims would be reduced pro rata.  Therefore, the usual procedure is to postpone payment until some time (usually after confirmation of a plan or conversion to Chapter 7) when the funds available to pay Chapter 11 administrative claims can be ascertained with some certainty.

If retiree benefits are to be paid immediately, these payments are not in the nature of administrative expenses, as their immediate payment would, in effect, grant to them a super-priority.  That is, the immediate payment in full of benefits during the pendency of a Chapter 11 case would skim these claims off the top of the fund which is available to pay all such claims, perhaps requiring the reduction of others.  On the other hand, if retiree benefits are to be paid according to the procedure by which all other administrative claims are paid, they will not, in a case such as the present one, be paid in a timely fashion as Congress envisioned.  Hence, from a practical standpoint, it is impossible to give full effect to both subsections (e)(1) and (e)(2), except where it is obvious that the debtor-in-possession has adequate funds to satisfy the costs of bankruptcy administration.

115 B.R. at 584-85.  Addressing that fact that the debtor had no unencumbered assets with which to make payments for retiree benefits, the *GF I* court noted that (i) section 1114 has no explicit remedy for noncompliance; (ii) the "usual remedies for noncompliance with Chapter 11 of the Bankruptcy Code are conversion to Chapter 7, dismissal, or the appointment of a trustee or examiner;" and (iii) "[n]one of these remedies would advance the cause of the retirees, . . ." *id.* at 585-86, and held that "the payment of the benefits must be made as soon as there are unencumbered assets available to make such payments." *Id.* at 586.  (Rather than have the case converted to chapter 7, where section 1114 does not apply, the parties reached a settlement. *In re GF II*, 120

B.R. at 421).  *See also In re Ionosphere Clubs, Inc.*, 134 B.R. 515, 524 (Bankr. S.D.N.Y. 1991).

**4.    ACE's Request For Costs Under Fed. R. Bankr. P. 9011**

In the light of the issues addressed by this opinion, to the extent, if any, that ACE's request for costs under Bankruptcy Rule  9011 is properly before the Court, it is, denied.  As noted, however, all of ACE's rights in respect of alleged violations of the automatic stay or the CBA are fully preserved, as are any defenses of the Trustees and the Union.

**Conclusion**

For the foregoing reasons, (i) the motion, insofar as it seeks relief under 11 U.S.C. §§ 365(b)(1), 503(b)(1)(A), 507(a)(1) and 1113(f), is denied; (ii) the motion, insofar as it seeks relief with respect to Delinquent Contributions to the Welfare Plan under 11 U.S.C. § 1114(e) is granted, subject, however, to further submissions regarding whether such contributions are entirely in respect of benefits for retirees, their spouses and dependents and, if not, whether only the portion of such contributions attributable to such benefits is covered by section 1114(e); (iii) the motion, insofar as it seeks priority payment of interest, liquidated damages, and attorney's fees and costs, is denied; and (iv) ACE's request for its costs is denied.

Dated:  New York, New York
        June 23, 2006

                                    /s/ ROBERT D. DRAIN
                                    United States Bankruptcy Judge